| | AUSA: | Stephen Hiyama | Telephone: | (313) 226-9674 |
|---|---|---|---|---|
| AO 91 (Rev. 11/11)  Criminal Complaint | Special Agent: | Bryan Taube, FBI | Telephone: | (313) 570-4207 |

# UNITED STATES DISTRICT COURT
for the

## Eastern District of Michigan

United States of America
   v.

JOHN R. LYNCH

Case No. 2:21−mj−30160
Assigned To : Unassigned
Assign. Date : 4/6/2021

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____11/2014 - 03/2017_____ in the county of _____Wayne_____ in the
____Eastern____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire fraud |
| 18 U.S.C. 1341 | Mail fraud |
| 18 U.S.C. 666(a)(1)(A) | Theft from organization receiving federal funds |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Bryan Taube, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

_____
*Judge's signature*

Date:  _April 6, 2021_____

City and state:  Flint, Michigan

Curtis Ivy, Jr. .- U.S Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A CRIMINAL COMPLAINT

I, Bryan Taube, a Special Agent of the Federal Bureau of Investigation, being duly sworn, upon my oath depose and state:

### INTRODUCTION

1.  I have been employed as a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice, since February 2003.  In my current capacity, I am assigned to the Detroit Division, Ann Arbor Resident Agency, located in Ann Arbor, Michigan. As a federal agent, I am authorized to, among other things, investigate violations of the criminal laws of the United States and execute federal search and arrest warrants.

2.  I have investigated a number of federal crimes, including bribery, conspiracy, extortion, wire fraud, mail fraud, fraud against the government, bank robbery, child pornography, and the theft of intellectual property rights. I have gained experience in conducting such investigation through training and everyday work related to these types of cases.

### PURPOSE OF THIS AFFIDAVIT

3.  This affidavit is being submitted to establish probable cause for a criminal complaint for JOHN R. LYNCH, a resident of Grosse Pointe Park, Michigan, for wire fraud (18 U.S.C. §1343), mail fraud (18 U.S.C. §1341), and the

theft, embezzlement, unlawful conversion, intentional misapplication, and obtaining by fraud of property under the care, custody, and control of an organization receiving federal funds (18 U.S.C. § 666(a)(1)(A)).

4.  Because this affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not set forth each and every fact that I and others have learned during the course of this investigation.  Rather, the affidavit sets forth a summary of the investigation to date in order to establish probable cause that **JOHN R. LYNCH** engaged in criminal conduct.

## BACKGROUND

5.  At all times relevant to this affidavit, the Holy Cross organization was made up of several Michigan entities, including

- Boysville of Michigan, Incorporated, dba "Holy Cross Children's Services" and "Holy Cross Services";

- Samaritan Center, Inc.;

- Holy Cross Properties, Inc.;

- Holy Cross Youth and Family Services, Inc., dba "Kairos Healthcare";

- Holy Cross Foundation of Michigan, Inc.; and

- HCYFS Outpatient Centers Inc., dba "Woodward Counseling," "Holy Cross Counseling," and "Holy Cross Women's Behavioral Health."

6.   *Boysville of Michigan, Incorporated*, the principal component of *the Holy Cross organization*, was established in 1948 as a Michigan nonprofit corporation that, according to its articles of incorporation, was supported and controlled by the Archbishop of the Roman Catholic Archdiocese of Detroit and the bishops of the other Roman Catholic dioceses in Michigan. In December 2001, Boysville of Michigan, Incorporated began using the assumed name of "**Holy Cross Children's Services**," and starting in 2015 it would sometimes also use the assumed name of "Holy Cross Services." (*Boysville of Michigan, Incorporated* will hereinafter be referred to as *Holy Cross Children's Services*.) *Holy Cross Children's Services* provided financial support, welfare and behavioral healthcare services, and other social services to children and families. It maintained a checking account at First Federal Bank of the Midwest.

7.   **Samaritan Center, Inc.**, another component of *the Holy Cross organization*, was a nonprofit corporation incorporated in Michigan in 2000. Its articles of incorporation stated that its purpose was carry out the purposes of *Holy Cross Children's Services* and SER Metro-Detroit, another nonprofit organization with a mission that overlapped with the mission of *Holy Cross Children's Services*. The Samaritan Center, which was located at 5555 Conner Street, Detroit, Michigan, was a large community resource center providing medical and mental health services, job training and placement services, educational programs,

spiritual ministries, and other forms of assistance to low-income residents on Detroit's east side.

8.  **Holy Cross Properties, Inc.**, another component of *the Holy Cross organization*, was a nonprofit corporation incorporated in Michigan in May 2012. *Holy Cross Properties*' articles of incorporation stated, in part, that its purpose was "[t]o operate exclusively for charitable purposes to hold title to real and personal property for the use of such property by an organization or organizations organized and operated for charitable, educational, religious or scientific purposes."

9.  In September 2012, a checking account was opened at Ann Arbor State Bank in the name of *Holy Cross Properties*. There were three authorized signers: John Lynch, a Holy Cross director, and Brother Francis Boylan, a brother of the Congregation of Holy Cross and the Executive Director of *the Holy Cross organization*.

10. Each of the of the main components of *the Holy Cross organization* was a tax-exempt, charitable organization under Section 501(c)(3) of the Internal Revenue Code.

11.  I was informed by Holy Cross management that in approximately March 2012, **JOHN R. LYNCH** became the CFO of *the Holy Cross organization*, working as an independent contractor. He was paid $15,000 a month ($180,000/year) in that capacity. In January 2015 he became a Holy Cross employee and the CEO of *the*

*Holy Cross organization* and was paid an annual salary of approximately $200,000.00. In April 2017 he was terminated by the board of directors of *the Holy Cross organization*. As the CFO and the CEO of *the Holy Cross organization*, **JOHN R. LYNCH** had primary control over the day-to-day finances of *the Holy Cross organization*.

12.  *Holy Cross Children's Services* maintained a corporate credit card account with American Express. About 10 Holy Cross employees were given American Express corporate credit cards that were to be used only for the business of *the Holy Cross organization*. John Lynch was one such employee. Charges on all of the corporate American Express credit cards were paid by *Holy Cross Children's Services*.

13.  I was informed by Holy Cross management that John Lynch controlled the activities of *Holy Cross Properties* and had complete control over the checking account of *Holy Cross Properties* at Ann Arbor State Bank. I was also informed by Holy Cross management that the accounting of the financial activities of *Holy Cross Properties* was not conducted by the central accounting office of *the Holy Cross organization*. Rather, any accounting of the financial activities of *Holy Cross Properties* was maintained on the work laptop computer provided to John Lynch by Holy Cross. During the investigation of Lynch, Holy Cross management found that the drive on Lynch's work laptop had been wiped clean of data.

**INTERNAL INVESTIGATION AND FEDERAL INVESTIGATION**

14.   In the spring of 2017, a Holy Cross employee noticed what appeared to be Lynch's use of his Holy Cross corporate American Express credit card to pay his personal expenses. As a result, the Board of Directors of *the Holy Cross organization* conducted a preliminary review of Lynch's activities at Holy Cross. That led to the Board's decision to hire an outside accounting firm to conduct a more comprehensive investigation of Lynch.

15.   The outside firm was Plante and Moran, PLLC, a large financial services firm based in Southfield, Michigan, that provides auditing, accounting, tax, investment banking, and wealth management services. Plante and Moran reviewed the financial and business records of *the Holy Cross organization* as well as records obtained from other sources. Its findings were contained in a report dated June 14, 2017. I was provided with a copy of that report and have reviewed it.

16.   In the course of this investigation, I interviewed several officers and administrators of *the Holy Cross organization*, including its current CEO (who was the chief operating officer of *the Holy Cross organization* under John Lynch) and its accounting director. I have referred and will continue to refer to these

individuals collectively as Holy Cross management. I also interviewed two directors of *the Holy Cross organization.*

## ILLEGAL USE OF HOLY CROSS FUNDS

### *Payment for New Roof for Personal Residence*

17.   The Plante & Moran audit report identified two checks drawn on the *Holly Cross Properties* checking account at Ann Arbor State Bank that were made payable to JS Home Improvements in the respective amounts of $5,000.00 and $7,500.00. The checks were dated August 5 and August 11, 2016. I have seen the signatures of John Lynch on his driver's license, corporate filings with the State of Michigan, and bank signature cards. The signatures on the two checks made payable to JS Home Improvements appear to be those of John Lynch.

18.   I interviewed John Sarotte, the owner of JS Home Improvements LLC, a company whose registered office is in Macomb Township, Michigan. Sarotte told me that JS Home Improvements installed a new roof on the house at 1352 Balfour Street, Grosse Pointe Park, Michigan. That is the personal residence of John Lynch and his wife. JS Home Improvements did not do commercial work, only home improvement projects. Sarotte subsequently provided me with business records confirming his statements about his company's work at 1352 Balfour Street.

### *Payment for Repairs on Personal Vehicles*

19.   The Plante & Moran audit report identified five checks drawn on the *Holy Cross Properties* checking account at Ann Arbor State Bank that were made payable to Mark Slate. I located and interviewed Mark Slate. He advised me that

he repaired cars at his home in Grosse Pointe Park as a side job. He repaired a number of cars over the years for John Lynch.

20.   Slate recalled repairing a 2007 Jeep Commander for Holy Cross and identified a handwritten invoice that he had prepared for his work on that vehicle. He gave the invoice to John Lynch. The invoice was directed to "Holy Children's Services" and itemized the repairs. Slate said that this was the only invoice he ever gave to Lynch. The amount of the invoice was $2,683.00, and there was a check in that amount dated December 10, 2015, made payable to Mark Slate drawn on the account of *Holy Cross Children's Services* at First Federal Bank of the Midwest. The check appears to have been signed with the stamped signature of Brother Francis Boylan.

21. I interviewed the chief facilities officer of Holy Cross. He told me that John Lynch wanted to buy the Jeep Commander. However, the vehicle was not running, and so Lynch took it to his friend in Grosse Pointe to get it running again. With a lot of work, Lynch's friend was able to get it running, but it broke down a couple of weeks later. Lynch never purchased the vehicle from Holy Cross. During this investigation, I learned that Holy Cross had a standing contract with Belle Tire to repair Holy Cross vehicles. Lynch's use of his friend Mark Slate and use of Holy Cross funds to pay him circumvented this procedure.

22.  Slate was shown an invoice dated June 2, 2015, that appeared to be prepared by Slate and was directed to *Holy Cross Properties* in the amount of $450.00. The invoice was for "Inspections of 3 Properties in Saginaw," and it was in a format completely different from the handwritten invoice described above in Paragraph 20 that Slate had provided to Lynch for repairs on the 2007 Jeep Commander. Slate told me that he did not conduct property inspections, did not go to Saginaw, and did not prepare or submit the invoice. (Holy Cross operated several programs in Saginaw.) Slate noticed that the invoice described his address as 1212 Whittier Road. His actual address is 1209 Whittier Road. Slate was also shown a check for $450.00, dated June 2, 2015, made payable to him and drawn on the account of *Holy Cross Properties* at Ann Arbor State Bank. The check corresponded with the "Inspections of 3 Properties in Saginaw" invoice and appears to have been signed by John Lynch. Slate advised it was possible the check was for auto repair work he did for Lynch.

23.  Slate received four other checks made payable to him and drawn on the account of *Holy Cross Properties* at Ann Arbor State Bank, all of which appear to have been signed by John Lynch. The check dates and amounts were as follows:

| | |
|---|---|
| 10/12/2015 | $   600.00 |
| 01/08/2016 | $   950.00 |
| 06/24/2016 | $   450.00 |
| 08/01/2016 | $   680.00 |

Based on my interview of Slate (see Paragraph 19 above), who told me that he had repaired a number of cars over the years for John Lynch, and my interview of the chief facilities officer of Holy Cross (see Paragraph 21 above), I believe it is fair to conclude that the only reason for these payments would have been to reimburse Slate for work he had done on Lynch's cars.

### *Payments on Personal American Express Account*

24.   The Plante & Moran audit report identified the use of other funds in the *Holy Cross Properties* checking account at Ann Arbor State Bank to pay the personal expenses of Lynch and his immediate family. Two checks were made payable to American Express. The checks were in the amounts of $2,962.27 and $4,401.48. American Express records show that these payments were for an account in the name of the wife of John Lynch. The two checks to American Express were negotiated in July 2016 and October 2016.

### *Payment on Personal Mortgage Loan Account*

25.   Fay Servicing, LLC is a residential mortgage servicer based in Chicago. The Plante & Moran audit report identified the use of funds in the *Holy Cross Properties* account at Ann Arbor State Bank to make a payment on a mortgage loan held by John Lynch and secured by his residence, 1352 Balfour Street, Grosse Pointe Park, Michigan. There was a *Holly Cross Properties* check, dated July 8, 2016, made payable to Fay Servicing in the amount of $7,194.76. The check

appears to have been signed by John Lynch. While most of the $7,194.76 paid down the principal, $2,250.70 was a late-payment fee.

### *Payments to JKL Consulting LLC, dba JKL Products*

26. *JKL Consulting LLC* was organized in the State of Michigan in August 2011. Its resident agent was the wife of John Lynch, and its registered office was at 5523 E. 9 Mile Road, Warren, Michigan. (5523 E. 9 Mile Road was the address of several companies that John Lynch had been associated with.) In September 2013, JKL Consulting LLC filed a certificate stating that it would do business under the assumed name of "*JKL Products*," and it listed its registered office as 1352 Balfour, Grosse Pointe Park, Michigan, which was the personal residence of John Lynch and his wife.

27. The Plante & Moran audit report identified six checks of interest drawn on the checking account of *Holy Cross Properties* at Ann Arbor State Bank and made payable to *JKL Consulting, JKL Products*, or *JKL Properties.* All six checks were issued when John Lynch was the CEO of *the Holy Cross organization* receiving an annual salary from Holy Cross of about $200,000. Three checks were made payable to *JKL Consulting*. The first, dated January 13, 2016, was in the amount of $7,125.00. The second, dated March 31, 2016, was in the amount of $1,850.00. And the third, dated May 16, 2016, was in the amount of $9,500.00. Two checks were made payable to *JKL Products*. The first, dated January 19,

2016, was in the amount of $11,500.00. And the second, dated September 20, 2016, was in the amount of $5,200.00. And one check, dated December 2, 2015, was made payable to *JKL Properties* in the amount of $4,700.00. The Plante & Moran audit team was unable to locate any records of *the Holy Cross organization* relating to these six payments to the *JKL* entities. There were no invoices, contracts, agreements, or any other records showing that the JKL entitles had done any work for *the Holy Cross organization*. Moreover, Holy Cross management related that these payments were a clear violation of the conflict-of-interest policy of *the Holy Cross organization*.

28.   The Plante & Moran audit report identified two checks of interest drawn on the checking account of *Holy Cross Children's Services* at First Federal Bank of the Midwest and made payable to *JKL Consulting.* The two checks were issued when John Lynch was the CEO of *the Holy Cross organization* receiving an annual salary from Holy Cross of about $200,000. One check, dated June 22, 2016, was in the amount of $7,500.00. There was a corresponding invoice from *JKL Consulting LLC, dba JKL Products* to *Holy Cross Children's Services*, which referred to the "HUBZone and Healthy Village Project." It also noted, "Deposit to Foremost Consulting and Healthy Detroit for Strategic Plan and Fundraising." As explained below in Paragraph 40, there was no HUBZone project at Holy Cross. And, as explained below in Paragraphs 31-32, Foremost Consulting appears to be nothing

more than a name tied to an individual who was long-time acquaintance or friend of John Lynch. Holy Cross management informed me that any amounts that Holy Cross owed relating to the Healthy Village Project would be paid by Holy Cross directly to Healthy Communities, LLC. The second check of interest, dated September 26, 2016, was made payable to *JKL Consulting* in the amount of $3,548.70. The Plante & Moran audit team could not locate any supporting documentation for this payment.

29.   The Plante & Moran audit report identified two additional checks of interest drawn on the checking account of *Holy Cross Children's Services* at First Federal Bank of the Midwest and made payable to *JKL Consulting*.  One check, dated January 20, 2015, was in the amount of $7,500.00. The corresponding invoice from *JKL Consulting LLC, dba JKL Products* to *Holy Cross Children's Services* referred to consulting services provided by *JKL Consulting*. The second check, dated February 6, 2015, was also for $7,500.00 and corresponded to another invoice from *JKL Consulting LLC, dba JKL Products* to *Holy Cross Children's Services* referring to consulting services provided by *JKL Consulting*. But the Plante & Moran audit team did not locate any records of *the Holy Cross organization* describing the nature of the consulting services or any agreements between *the Holy Cross organization* and *JKL Consulting*. Moreover, during the one-month period covered by these invoices, January 16 to February 15, 2015,

John Lynch was the CEO of Holy Cross receiving an annual salary from Holy Cross of about $200,000.

30.   The Plante & Moran audit report identified two checks of interest drawn on the account of *Holy Cross Children's Services* at First Federal Bank of the Midwest and made payable to *JKL Products*. One check, dated November 19, 2014, was in the amount of $3,000.00. The corresponding invoice from *JKL Consulting LLC, dba JKL Products* to *Holy Cross Children's Services* referred to work on the HUBZone project by a subcontractor, Foremost Consulting. There was also an invoice from "Foremost Consulting Group" to *JKL Consulting LLC*, dated September 25, 2014, for $3,000.00. The Foremost invoice referred to IT services for the HUBZone project. The second check to *JKL Products*, dated February 23, 2015, was in the amount of $4,560.00. The corresponding invoice from *JKL Consulting LLC, dba JKL Products* to *Holy Cross Children's Services* referred to work on the HUBZone project by a subcontractor, Foremost Consulting. As explained below in Paragraph 40, there was no HUBZone project at Holy Cross. There was also an invoice from "Foremost Consulting" to Holy Cross/*JKL Consulting*, dated January 30, 2015, for $4,560.00. It referred to custom software for a Holy Cross distribution project.

31. The address used on the Foremost Consulting invoices was 1930 Norwood Drive, Grosse Pointe Woods, Michigan. That is the residence of Mark

Shook. There is evidence that Mark Shook and John Lynch are longtime acquaintances, friends, and/or associates. John Lynch was the managing partner of Collision on Wheels International, LLC (CWI), whose registered office was at 5523 E. 9 Mile Road, Warren, Michigan. Mark Shook is believed to be the brother of Terry Shook, who was an officer/employee of CWI. Mark Shook, Terry Shook, John Lynch, and others were defendants in a complaint filed in July 2012 by the bankruptcy trustee of CWI, which had filed for bankruptcy in July 2010. Also, when John Lynch applied with the State of Michigan for a CPA license in December 1989, Mark Shook was listed as one of his three references.

32.   There is no reason to believe that a there was a business called Foremost Consulting that was located at 1930 Norwood Drive, a residence in Grosse Pointe Woods, Michigan. The only "Foremost Consulting" on file with the Michigan Department of Licensing and Regulatory Affairs is Foremost Consulting, LLC, established on March 16, 2015, with a registered office in Monroe, Michigan. There is no mention of a Mark Shook or any of the Grosse Pointes. Moreover, as noted above in Paragraph 30 and below in Paragraph 33, the three invoices to JKL Consulting from the business at 1930 Norwood Drive stated that the business's name was "Foremost Consulting Group," "Foremost Consulting," and "Formost Tech Services." Two of the invoices used the zip code "48236," while one used "48230."

33.   The Plante & Moran audit report identified two additional checks of interest drawn on the account of *Holy Cross Children's Services* at First Federal Bank of the Midwest and made payable to *JKL Products*. One check, dated March 16, 2016, was in the amount of $3,500.00. The corresponding invoice from *JKL Consulting LLC, dba JKL Products* to *Holy Cross Children's Services*, dated March 16, 2016, referred to the development of a database for the Healthy Village Project by Foremost Tech Services. The second check, dated April 19, 2016, was in the amount of $4,157.82. Plante and Moran found that $3,500.00 of that check corresponded to an invoice dated April 19, 2016, in the amount of $3,500.00 from *JKL Consulting LLC, dba JKL Products* to *Holy Cross Children's Services*. That invoice referred to the development of a database for the Healthy Village Project by Foremost Tech Services. There was also an invoice from "Formost [sic] Tech Services" to *JKL Consulting* for $10,000.00 less a $3,000.00 discount, which reflected two payments of $3,500.00. The address on the Formost Tech Services invoice was 1930 Norwood, Grosse Pointe Woods, Michigan.

34.   The Plante & Moran audit report identified three more checks of interest drawn on the account of *Holy Cross Children's Services* at First Federal Bank of the Midwest made payable to *JKL Products*. The first check was dated April 21, 2015, and was in the amount of $1,800.00. The corresponding invoice from *JKL Consulting LLC, dba JKL Products* to *Holy Cross Children's Services* indicated

that this was an advance for training for Salesforce software. Holy Cross

management told Plante & Moran that Holy Cross never paid Salesforce for a

license to use its software because Salesforce provided free licenses to nonprofit

organizations, which Holy Cross used for about three years. And Holy Cross never

paid Salesforce for any training, which Salesforce typically provides to licensees

for free. The second check was dated February 19, 2016, and was in the amount of

$8,000.00. The corresponding invoice from *JKL Consulting LLC, dba JKL*

*Products* to *Holy Cross Children's Services* referred to an "Integrated Health Care

Initiative Data Base and Billing System." Holy Cross management informed the

Plante and Moran audit team that the initiative had been discussed but never

adopted by Holy Cross, and thus, there would have been no need for Holy Cross to

finance the development or acquisition of such a system. And the third check made

payable to *JKL Products*, dated August 18, 2015, was in the amount of $1,365.00.

The Plante & Moran audit team could not locate any supporting documentation for

this payment.

### *Payments to First Nation Security LLC*

35.   *First Nation Security LLC* was organized in the State of Michigan in

January 2013. The articles of organization stated that its resident agent was John

Lynch's brother-in-law (the brother of John Lynch's wife) and its registered office

was located at the residence of John Lynch's brother-in-law, in Grosse Pointe

Woods, Michigan. The mailing address listed on the articles of organization for *First Nation Security* was 5555 Conner Street, Detroit, Michigan. That is the address of *the Samaritan Center*, a component of *the Holy Cross organization* described above in Paragraph 7.

36.   The 2014 annual report/information update of *First Nation Security* on file with the Michigan Department of Licensing and Regulatory Affairs lists John Lynch's brother-in-law as its resident agent and the brother-in-law's residence as its registered office. It was signed by John Lynch as the CFO of First Nation Security LLC. The 2015 annual report/information update of *First Nation Security* on file with the Michigan Department of Licensing and Regulatory Affairs lists 1352 Balfour, Grosse Pointe Park, Michigan, as the location of its registered office, which is the personal residence of John Lynch and his wife. It also lists John Lynch's sister, a resident of Florida, as its resident agent.

37.   According to Holy Cross management, as soon as *First Nation Security* was formed in January 2013, it entered into an unwritten agreement with Holy Cross to provide security at the Samaritan Center. The agreement was negotiated by John Lynch, on behalf of *First Nation Security*, and Brother Francis Boylan, on behalf of Holy Cross. The negotiations and agreement were a clear violation of Holy Cross's conflict-of-interest policy. At the time, Lynch was the CFO of *the*

*Holy Cross organization*. And there was no bidding on this contract, contrary to Holy Cross policy.

38.   According to Holy Cross management, John Lynch's brother-in-law, a retired police officer, ran the day-to-day operations of *First Nation Security*, and John Lynch handled the financial matters of *First Nation Security*.

39.   Although, subsequent corporate filings indicated that John Lynch's sister was First Nation Security's CEO, John Lynch's brother-in-law and John Lynch continued to operate *First Nation Security*, according to John Lynch's sister.

40.   The Plante & Moran audit report identified three checks of interest drawn on the account of *Holy Cross Children's Services* at First Federal Bank of the Midwest and made payable to *First Nation Security*. The first, dated July 27, 2015, was in the amount of $15,000.00. The second, dated, January 12, 2016, was in the amount of $12,000.00. And the third, dated April 19, 2016, was in the amount of $8,000.00. There was an invoice that corresponded with each of the three checks. The invoices were issued by *First Nation Security* to *Holy Cross Children's Services*, and they referred to the "Hub Zone Project." To qualify as a HUBZone business, a certain number of the company's employees must reside in the HUBZone in which the company is located. Holy Cross's facilities chief told the Plante and Moran team that the Samaritan Center, which is located in a HUBZone on Detroit's east side, did not meet that requirement. Thus, there was no

HUBZone project at Holy Cross. ("HUBZone" stands for historically underutilized business zone. The HUBZone program is administered by the U.S. Small Business Administration and helps small businesses in urban and rural communities with high unemployment gain preferential access to federal procurement opportunities.)

41.   The Plante & Moran audit report identified two checks of interest drawn on the account of *Holy Cross Properties* at Ann Arbor State Bank made payable to *First Nation Security*. The first, dated August 13, 2015, was in the amount of $4,500.00. The second, dated, April 21, 2016, was in the amount of $2,000.00. The Plante & Moran audit team could not locate any supporting documentation for these payments.

42.   According to John Lynch's brother-in-law, in the spring of 2015 Lynch told him there was  a "profit sharing" check from Holy Cross related to a Holy Cross security position at the Samaritan Center called "life safety officer." Lynch suggested to his brother-in-law that he and the brother-in-law split the money. Beginning in May 2015 and ending in August 2016, Lynch issued or caused to be issued 14 checks drawn on the checking account of *Holy Cross Children's Services* at First Federal Bank of the Midwest that were made payable to his brother-in-law. The 14 checks totaled $39,150.00. Lynch's brother-in-law deposited the checks into his personal checking account, and he reciprocated by writing eight checks drawn on his personal checking account that he made payable to Lynch. The first

check was issued in May 2015 and the last in March 2016. Lynch's brother-in-law wrote a ninth check in January 2017 in the amount of $2,500.00, which was made payable not to Lynch but to KTK Professional Services. The nine checks totaled $21,895.50. KTK Professional Services, LLC was formed by Lynch's brother-in-law in December 2016. It is believed that KTK are the combined initials of John Lynch's wife and brother-in-law. Holy Cross management has indicated that there was no "profit sharing" or other legitimate explanation for the payments. In all, Lynch's brother-in-law received $39,150.00 in Holy Cross funds for no reason, and he kicked back $21,895.50 of that to Lynch.

### *Personal Use of Holy Cross Corporate AmEx Credit Card*

43.    *Holy Cross Children's Services*, the principal entity of *the Holy Cross organization*, maintained a corporate credit card account with American Express. About 10 Holy Cross employees were given AmEx corporate credit cards that were to be used only for Holy Cross business. John Lynch was one such employee. Charges on all of the corporate AmEx credit cards were paid by Holy Cross.

44.    The Plante & Moran audit team reviewed Lynch's use of his corporate American Express credit card during the period June 2014 through March 2017. After reviewing the relevant American Express and Holy Cross records and speaking with several Holy Cross employees, the audit team found that Lynch had used his corporate American Express credit card to pay for goods and services of a

personal nature that were unrelated to Holy Cross business. These unauthorized charges added up to about $36,500.00.

45.   The following transactions represent just a few of John Lynch's improper AmEx charges:

| Date | Payee | Amount |
|---|---|---|
| 01/02/2015 | Boyne Highlands | $1,457.00 |
| 05/01/2015 | Lululemon Athletica, Ann Arbor | $ 212.00 |
| 02/16/2016 | Farmer's Table, Boca Raton | $ 278.20 |
| 02/18/2016 | Ocean Sky Hotel & Resort, Ft. Lauderdale | $ 735.72 |
| 02/18/2016 | Ocean Sky Hotel & Resort, Ft. Lauderdale | $ 565.21 |
| 03/21/2016 | Grosse Pointe South Dugout Club | $ 675.00 |
| 07/18/2016 | Macy's, Troy | $ 225.64 |
| 09/03/2016 | Shepler's Mackinac Island Ferry | $ 290.00 |
| 09/03/2016 | Sunset Condominiums, Mackinac Island | $ 515.42 |
| 09/04/2016 | Mission Point Restaurant, Mackinac Island | $ 119.62 |
| 11/19/2016 | Sam's Club, Roseville | $ 778.80 |
| 12/28/2016 | Belle Tire of Grosse Pointe | $1,174.52 |
| 01/26/2017 | Bed Bath and Beyond | $ 233.03 |

## INVOICES FOUND IN THE RECORDS OF HOLY CROSS

46.   Some of the paragraphs set forth above describe certain improper disbursements from the checking accounts of *Holy Cross Properties* at Ann Arbor State Bank and *Holy Cross Children's Services* at First Federal Bank of the Midwest. To the extent that the Plante & Moran audit team located invoices

relating to these disbursements, they are all strikingly similar, using the same format, template, and font. They basically look the same. Here are four examples:

| Date | Invoice | Amount |
|------|---------|--------|
| 09/25/2014 | Foremost Consulting to JKL Consulting | $3,000.00 |
| 11/19/2014 | JKL Consulting to HC Children's Services | $3,000.00 |
| 06/02/2015 | Mark Slate to HC Properties | $ 450.00 |
| 04/16/2016 | First Nation Security to HC Children's Services | $8,000.00 |

## INTERSTATE ELECTRONIC COMMUNICATIONS, U.S. MAIL, FEDERAL FUNDING

47. I know through my experience as a special agent of the FBI that as a part of the ordinary check-clearing process, a check will cause funds to be transferred from the bank on which the check is drawn to the bank of the check payee. Another part of that process requires that the paper check itself or, much more often, a digital copy of the check will be returned to the bank on which the check was drawn. A paper check will be returned to that bank via the U.S. Postal Service or a commercial interstate carrier; a digital copy of the check will be returned to that bank electronically, which will invariably involve one or more interstate wire communications.

48. Holy Cross management informed me that *Holy Cross Children's Services* paid American Express every month by either sending a check to American Express by mail or authorizing an electronic funds transfer from its checking account at First Federal Bank of the Midwest to American Express.

49.  I know through my experience as a special agent of the FBI that the use of an American Express credit card results in interstate electronic communications and affects interstate commerce. When a customer uses an American Express credit card at a store (the merchant), information is transmitted electronically from the merchant's card reader to the merchant's credit card processor. The major credit card processors in the United States are based outside of Michigan and are often affiliated with large banks. The credit card processor will transmit electronically the information received from the merchant to the appropriate credit card network. American Express operates its own credit card network and has two bank subsidiaries based in Salt Lake City that issue American Express credit cards. The sales information originating with the merchant and forwarded to the credit card processor and credit card network eventually results in a debit to the American Express accountholder's account and a corresponding electronic funds transfer from an American Express bank subsidiary to the merchant's bank. Given the relative complexity and interconnectivity of credit card processing, it is inevitable that, for any given credit card purchase, information will be transmitted electronically between and among computers and computer servers located in multiple states, including the state in which the purchase occurred.

50.  I have been informed by Holy Cross management that Holy Cross receives federal funds every year through the Michigan School Nutrition Program

(SNP). As a part of the SNP, the Michigan Department of Education administers two programs that are federally funded: the federal National School Lunch Program and the federal School Breakfast Program. These programs are administered at the federal level by the Food and Nutrition Service of the U.S. Department of Agriculture.  In 2016, for example, Holy Cross received approximately $150,000.00 in SNP funding. Holy Cross also receives federal funding through Title IV of the Social Security Act, which provides grants to states to fund, among other things, services to needy families with children, programs designed to protect children and promote their welfare, and programs facilitating foster care and adoption when appropriate.

## CONCLUSION

51.  In light of the information and evidence described above, I submit that there is probable cause to believe that **JOHN R. LYNCH** committed the following federal offenses in the Eastern District of Michigan:

- From no later than November 2014 through at least March 2017, John Lynch, did knowingly execute and attempt to execute a scheme and artifice to defraud Holy Cross and to obtain the money and property of Holy Cross by means of false and fraudulent pretenses and representations and did, for the purpose of furthering the scheme, cause the transmission by wire in interstate commerce certain electronic signals and communications, in violation of 18 U.S.C. § 1343.

- From no later than November 2014 through at least March 2017, John Lynch, did knowingly execute and attempt to execute a scheme and artifice to defraud Holy Cross and to obtain the money and property of Holy Cross by means of false and fraudulent pretenses and representations and did, for the purpose of furthering the scheme, knowingly cause to be sent or delivered by the U.S. Postal Service or by a commercial interstate carrier certain Holy Cross checks, in violation of 18 U.S.C. § 1341.

- From no later than November 2014 through at least March 2017, John Lynch, being an agent of the Holy Cross organization, an organization receiving in any one year period benefits in excess of $10,000 under a Federal program involving a grant or other form of Federal assistance, did steal, embezzle, unlawfully convert, intentionally misapply, and obtain by fraud property valued at $5,000 or more that was under the care, custody, and control of the Holy Cross organization, in violation of 18 U.S.C. § 666(a)(1)(A).

_____
BRYAN TAUBE, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence
and/or by reliable electronic means

Date:   April 6, 2021

_____
CURTIS IVY, JR.
United States Magistrate Judge

- 27 -