UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

-vs-

D-1   JOHN R. LYNCH,

               Defendant.

_____/

Case: 2:21−cr−20452
Assigned To : Friedman, Bernard A.
Referral Judge: Patti, Anthony P.
Assign. Date : 7/13/2021
Description: INFO USA v. LYNCH (SO)

VIO:  18 U.S.C. § 1343

# **INFORMATION**

THE UNITED STATES ATTORNEY CHARGES:

## **GENERAL ALLEGATIONS**

### **The Holy Cross Organization**

1.  At all times relevant to this Information, *the Holy Cross organization* was a section 501(c)(3) charitable organization. It had over 350 employees and was made up of several nonprofit corporations, including but not limited to Boysville of Michigan, Incorporated (dba "Holy Cross Children's Services"); Holy Cross Youth and Family Services, Inc. (dba "Kairos" and "Kairos Healthcare"); HCYFS Outpatient Centers Inc. (dba "Woodward Counseling" and "Holy Cross Counseling"); Samaritan Center, Inc.; and Holy Cross Properties, Inc. The main

offices of *the Holy Cross organization* were located in Clinton, Michigan, in the Eastern District of Michigan. Most of the activities of *the Holy Cross organization* (referred to hereinafter as *Holy Cross*) took place in Southeast Michigan and Mid-Michigan.

2. *Holy Cross* provided financial support and services to children, families, and adults, including but not limited to medical, mental, and behavioral healthcare services; residential assistance for the homeless; independent living assistance; foster care; job training and placement services; educational programs; meals; spiritual ministries; transportation services, and other social services.

3. In March 2012, defendant JOHN R. LYNCH, who had been a licensed CPA, became the CFO of *Holy Cross*. In January 2015 he became the CEO of *Holy Cross*. As the CFO of *Holy Cross* and then its CEO, LYNCH had overall responsibility for the activities of *Holy Cross* as well as complete control over its day-to-day finances and the day-to-day operations of its accounting department. LYNCH's annual salary as the CEO of *Holy Cross* was approximately $200,000.

4. The principal checking accounts of *Holy Cross* were maintained at First Federal Bank of the Midwest in the names of *Holy Cross Children's Services* and *Kairos Healthcare*. These checking accounts were under the immediate control of the accounting department of *Holy Cross* and used in accordance with established *Holy Cross* accounting procedures and practices.

5.  In September 2012, a few months after he joined *Holy Cross*, JOHN LYNCH opened a checking account at Ann Arbor State Bank in the name of *Holy Cross Properties*. LYNCH caused funds from other *Holy Cross* bank accounts to be transferred into the *Holy Cross Properties* checking account.

6.  *Holy Cross* maintained a corporate credit card account with American Express. About 10 *Holy Cross* employees, including JOHN LYNCH, were given American Express corporate credit cards that were to be used only for the business of *Holy Cross*. Charges on all of the corporate American Express credit cards were paid by *Holy Cross*.

7.  The activities of *Holy Cross* were funded in large part with public funds. *Holy Cross* received federal funds directly or indirectly through the federal National School Lunch Program; through the federal School Breakfast Program; through Part E of Title IV of the Social Security Act, which provided grants to states to fund, among other things, services to needy families with children, programs designed to protect children and promote their welfare, and programs facilitating foster care and adoption when appropriate; and through the Enhanced Mobility of Seniors and Individuals with Disabilities Program administered by the U.S. Department of Transportation, which provided funds to assist private nonprofit groups in meeting the transportation needs of older adults and people with disabilities.

## JKL Consulting LLC / JKL Products

8. *JKL Consulting LLC* was organized in the State of Michigan in August 2011 by JOHN LYNCH and his wife. It also used the assumed name of *JKL Products*, and it listed its registered office as 1352 Balfour, Grosse Pointe Park, Michigan, the personal residence of JOHN LYNCH and his wife.

## First Nation Security, LLC

9. *First Nation Security, LLC* was organized in the State of Michigan in January 2013 by a brother-in-law of JOHN LYNCH (a brother of Lynch's wife), and the address of its registered office was initially the residence of LYNCH's brother-in-law, in Grosse Pointe Woods, Michigan. Later, the address of the registered office was the residence of LYNCH and his wife, in Grosse Pointe Park. The resident agent of *First Nation Security* was initially LYNCH's brother-in-law, and then it was one of LYNCH's sisters, a resident of Florida. LYNCH's brother-in-law ran the day-to-day operations of *First Nation Security*, and LYNCH handled the finances of *First Nation Security*. *First Nation Security* was under contract with *Samaritan Center, Inc.* to provide security services. *Samaritan Center, Inc.* was a large community resource center on Detroit's east side that was a part of the *Holy Cross organization*. Social services and other forms of assistance were provided to low-income residents at the *Samaritan Center*.

- 4 -

### SCHEME TO DEFRAUD

10.  From no later than November 2014 through March 2017, in the Eastern District of Michigan and elsewhere, **JOHN R. LYNCH**, defendant herein, did knowingly plan and carry out a scheme to defraud *Holy Cross* and obtain and deprive it of money and property by means of false and fraudulent pretenses and representations.

11.  It was a part of the scheme that JOHN LYNCH would use his unchallenged authority as the CFO of *Holy Cross* and then as its CEO to cause the unauthorized transfer of *Holy Cross* funds to entities he controlled and/or in which he had a significant personal and financial interest, namely, *JKL Consulting LLC,* dba *JKL Products,* and *First Nation Security LLC*. These payments were made from the checking account of *Holy Cross Children's Services* at First Federal Bank of the Midwest and from the checking account of *Holy Cross Properties* at Ann Arbor State Bank. LYNCH directed the *Holy Cross* accounting department to issue checks drawn on the checking account of *Holy Cross Children's Services* and make them payable to those entities, and he manufactured false invoices and provided them to the *Holy Cross* accounting department to justify those payments. And LYNCH himself wrote checks payable to those entities that were drawn on the checking account of *Holy Cross Properties*.

12.  It was also a part of the scheme that JOHN LYNCH would use his unchallenged authority as the CFO of *Holy Cross* and then as its CEO to cause the unauthorized transfer of *Holy Cross* funds through the *Holy Cross Properties* checking account at Ann Arbor State Bank to make direct payments for his personal expenses. LYNCH himself maintained physical control of the checkbook for the *Holy Cross Properties* checking account, withheld information about the activity in that account from the *Holy Cross* accounting department, and kept that account segregated from *Holy Cross*'s accounting systems. LYNCH wrote checks drawn on that account to pay personal expenses, which he made payable to American Express (for a personal credit card account); the servicer of his personal mortgage loan; *First Nation Security, LLC*; a company that installed a new roof on his house; an acquaintance who did repair work on his cars; and the Grosse Pointe South Gridiron Club.

13.  It was also part of the scheme that JOHN LYNCH would use his unchallenged authority as the CFO of *Holy Cross* and then as its CEO to use his corporate *Holy Cross* American Express credit card to purchase goods and services that were not related to the business of *Holy Cross* but were rather for his personal benefit. These unauthorized charges included but were not limited to payments for lodging at resorts, dining at restaurants, travel (Delta Airlines), clothing purchased at apparel and department stores, groceries, and federal income taxes. LYNCH

failed to disclose to the Holy Cross accounting department that the charges were personal, as he was required to. And he thereby led *Holy Cross* administrators to believe, contrary to fact, that these charges were related to the business of *Holy Cross* and legitimate. All charges on the corporate Holy Cross American Express account were paid by *Holy Cross*.

14.  It was also a part of the scheme that JOHN LYNCH would use his unchallenged authority as the CFO of *Holy Cross* and then as its CEO to cause the unauthorized transfer of Holy Cross funds to his brother-in-law. These payments were made from the checking account of *Holy Cross Children's Services* at First Federal Bank of the Midwest. LYNCH failed to disclose to and concealed from *Holy Cross* administrators that these checks were not payments for goods or services provided to *Holy Cross* but were rather unauthorized payments to his brother-in-law that would be used, in part, to pay kickbacks to LYNCH.

## COUNT 1
### (18 U.S.C. § 1343 – Wire Fraud)

D-1    JOHN R. LYNCH

15.  The allegations set forth above in Paragraphs 1-14 are hereby realleged and incorporated by reference.

16.  On numerous occasions during the course of his scheme and in furtherance of his scheme, which continued through March 2017, **JOHN R. LYNCH**,

- 7 -

defendant herein, did knowingly cause electronic communications to be

transmitted in interstate commerce, which were transmitted to or from the Eastern

District of Michigan and associated with the check clearing process for checks

drawn on the checking account of *Holy Cross Children's Services* at First Federal

Bank of the Midwest; with the check clearing process for checks drawn on the

checking account of *Holy Cross Properties* at Ann Arbor State Bank; and with

electronic payments made by *Holy Cross* to American Express.

All in violation of Section 1343 of Title 18 of the United States Code.

### FORFEITURE ALLEGATIONS
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)

17.  The allegations set forth above in Paragraphs 1-16 are hereby

realleged and incorporated by reference for the purpose of alleging forfeiture

pursuant to 18 U.S.C. § 981(a)(l)(C) and 28 U.S.C. § 2461.

18.  As a result of the forgoing violation of 18 U.S.C. § 1343, as set forth in

Count One of this Information, defendant shall forfeit to the United States of

America any property, real or personal, which constitutes or is derived from

proceeds traceable to said violation.

19. *Substitute Assets*:  Pursuant to 21 U.S.C. § 853(p), as incorporated by 28

U.S.C. § 2461(c), the United States of America shall be entitled to forfeiture of

substitute property up to the value of the above forfeitable property if, by any act or omission of the defendant, the above forfeitable property or any portion thereof

    A.    cannot be located upon the exercise of due diligence;

    B.    has been transferred or sold to, or deposited with, a third party;

    C.    has been placed beyond the jurisdiction of the court;

    D.    has been substantially diminished in value; or

    E.    has been commingled with other property which cannot be divided without difficulty.

SAIMA S. MOHSIN
Acting United States Attorney

 s/John K. Neal
JOHN K. NEAL
Assistant United States Attorney
Chief, White Collar Crime Unit

 s/Stephen L. Hiyama
STEPHEN L. HIYAMA
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226
phone:  313-226-9674
email:   stephen.hiyama@usdoj.gov

Date:  July 13, 2021

bar no.:  P32236

| United States District Court Eastern District of Michigan | Criminal Case Cover Sheet | Case Number 2:21-CR-20452 |
|---|---|---|

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

| Companion Case Information | Companion Case Number: |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | Judge Assigned: |
| ☐ Yes   ☒ No | AUSA's Initials: _SLH_ |

**Case Title:** USA v.   JOHN R. LYNCH

**County where offense occurred :**  Wayne

**Check One:**   ☒ Felony      ☐ Misdemeanor      ☐ Petty

_____Indictment/_____Information --- **no** prior complaint.
_____Indictment/__✓__Information --- based upon prior complaint [Case number: 21-mj-30160      ]
_____Indictment/_____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** _____   **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

July 13, 2021
Date

Stephen L. Hiyama
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone: 313-226-9674
Fax:   313-226-0816
E-Mail address: stephen.hiyama@usdoj.gov
Attorney Bar #:  P32236

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.