UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                  No. 21-CR-20452

-vs-                                Hon. Bernard A. Friedman

D-1   JOHN R. LYNCH,

               Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

### I. PROCEDURAL HISTORY

In April 2021, a criminal complaint was filed in this district charging defendant John Lynch with wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and theft from an organization receiving federal funds (18 U.S.C. § 666(a)(1)(A). (ECF No. 1: Criminal Complaint, No. 21-MJ-30160.) A little over two months later, the parties reached a preindictment plea agreement. Defendant waived prosecution by indictment (ECF No. 19: Waiver of Indictment), and on July 13, 2021, the government filed a one-count Information charging defendant with wire fraud. (ECF No. 17: Information.)

On September 8, 2021, defendant pleaded guilty before this Court to Count One of the Information. (ECF No. 23: Plea Agreement, PageID.88,) This Court accepted the guilty plea and took the plea agreement under advisement. In the plea agreement, the parties agreed to recommend that this Court find that defendant's total offense level is 18. (ECF No. 23: Plea Agreement, PageID.93-94.). With a criminal history category of I, a total offense level of 18 produces an advisory Sentencing Guidelines range of **27-33 months in prison**. *See* PSR ¶ 71. The government agreed to recommend that any term of imprisonment imposed by this Court not exceed the top of the advisory guideline range determined by this Court. (ECF No. 23: Plea Agreement, PageID.96.)

## II.  HOLY CROSS AND JOHN LYNCH

In 1948, *Boysville of Michigan* was founded by the Roman Catholic Archdiocese of Detroit and several Michigan Roman Catholic dioceses as an entity that would "operate an elementary school, high school, and institution of vocational training for boys." Eventually, Boysville of Michigan adopted the assumed name of *Holy Cross Children's Services*. *Holy Cross Children's Services* became the principal component of *the Holy Cross organization* (hereinafter referred to as Holy Cross) and provided social services to children and families in Southeast Michigan and Mid-Michigan.

- 2 -

In the early 1980s, Holy Cross moved its main office from Detroit to Clinton, Michigan, about 20 miles southwest of Ann Arbor.

Historically, the family of defendant had very close ties with Holy Cross and it executive director, Brother FB, a member of the Congregation of Holy Cross. Defendant's father served on the board of directors of Holy Cross and volunteered there for over 20 years. Also, one of defendant's brothers was on the Holy Cross board of directors for several years, through 2010.

Through his family connections and the support of Brother FB, defendant was hired in March 2012 to be the CFO of Holy Cross, working as an independent contractor. He was paid $15,000 a month ($180,000/year) in that capacity. In January 2015 he became a Holy Cross employee and the CEO of Holy Cross and was paid an annual salary of approximately $200,000.00. Defendant also became a member of the board of directors of Holy Cross.

The website of Holy Cross, now known as *Holy Cross Services*, describes itself as follows:

> Holy Cross Services is a human services agency whose mission is to bring hope, promote change, and help people live free, healthy, and productive lives. Holy Cross has two main service areas: Children and Family Services (residential) and community-based services and programs, including Independent Living Plus, Independent Living, Juvenile Justice Transition, Young Adult Voluntary Foster Care, and Homeless and Housing Services for veterans, adults, children and families.

- 3 -

Founded in 1948, Holy Cross touches the lives of approximately 1,000 people every day who are abused, neglected, traumatized, and/or who suffer from addiction and mental health issues across Michigan, plus over 6,000 veterans, children and adults in Lansing, Michigan, facing homelessness. Holy Cross Services is a private, 501c3 non-profit Michigan organization.

.     .     .     .

Our vision and values, based on our Catholic/Christian heritage, are the foundation of our treatment approach and are shared by our clients and staff as they live out their lives practicing respect, healthy relationships, community, solidarity, concern for the poor and vulnerable, and value helping others like they have been helped.

https://holycrossservices.org/about-holy-cross-services.

The operations and activities of Holy Cross were funded in part by private contributions (including contributions from defendant's father). They were also funded in part with federal funds. Holy Cross received federal funds directly or indirectly through the federal National School Lunch Program; through the federal School Breakfast Program; through Part E of Title IV of the Social Security Act, which provided grants to states to fund, among other things, services to needy families with children, programs designed to protect children and promote their welfare, and programs facilitating foster care and adoption when appropriate; and through the Enhanced Mobility of Seniors and Individuals with Disabilities Program, administered by the U.S. Department of Transportation, which provided

- 4 -

funds to assist private nonprofit groups in meeting the transportation needs of older adults and people with disabilities.

Defendant's tenure with Holy Cross, which began in March 2012, ended in April 2017, when he was terminated by the Holy Cross board of directors as a result of the criminal conduct embraced by this federal prosecution.

### III.  THE POST-*BOOKER* SENTENCING PARADIGM

This Court, of course, is very familiar with the basic sentencing process that exists post-*Booker*. Although the guideline range is now advisory rather than mandatory, a district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[E]ven in an advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review.'" *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) (quoting *Peugh v. United States,* 569 U.S. 530, 541 (2013)).

The district court should then consider the guideline range along with the other six factors prescribed in section 3553(a) before imposing sentence.[1] *See, e.g,* *Gall*, 552 U.S. at 49-50.

---

[1]  Section 3553(a) reads:

_____

      (a) *Factors to be considered in imposing a sentence.* – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

      (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines – (i) issued by the Sentencing Commission . . . ; and (ii) that . . . are in effect on the date the defendant is sentenced;

      .    .    .    .

(5) any pertinent policy statement –

      (A) issued by the Sentencing Commission . . . ; and

      (B) that . . . is in effect on the date the defendant is sentenced[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

"After settling on the appropriate sentence, [the district court] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50.

The Sixth Circuit "may conclude that a sentence is unreasonable when the district judge fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a)." *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005). Likewise, "[a district] court commits procedural error if it . . . 'fail[s] to adequately explain the chosen sentence.'" *United States v. Odeh*, 815 F.3d 968, 983 (6th Cir. 2016) (quoting *Gall*, 552 U.S. at 51).

### IV. DEFENDANT'S GUIDELINE RANGE

As noted above, the parties agreed to recommend that this Court find that defendant's total offense level is 18. (ECF No. 23: Plea Agreement, PageID.93-94.) The probation officer agrees. PSR ¶ 40. The parties and probation officer also agree that defendant is in criminal history category I and that his advisory guideline range is **27-33 months in prison**. PSR ¶¶ 42, 71.

---

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## V.  THE OTHER 3553(a) FACTORS

### A.  The Nature and Circumstances of the Offense

#### 1. *Overview*

A district court "shall consider – (1) the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). As the CFO and then the CEO of Holy Cross, defendant had primary control over the day-to-day finances of Holy Cross. His thefts from Holy Cross revolved around the principal checking account of Holy Cross, at First Federal Bank of the Midwest, which was in the name of *Holy Cross Children's Services*, and a checking account opened by defendant at Ann Arbor State Bank shortly after he joined Holy Cross in the name of *Holy Cross Properties, Inc*. Defendant controlled the former checking account by directing the accounts payable clerk of Holy Cross to prepare checks in the usual course of Holy Cross's business that were payable in specific amounts to specific payees. These checks contained the e-signature of Brother FB. Defendant controlled the latter checking account by maintaining physical control of the checkbook and writing and signing checks himself or directing the accounts payable clerk to write checks and sign his name.

The investigation found that defendant had caused a total of **$134,567.40** in unauthorized disbursements to be made from the *Holy Cross Children's Services*

checking account at First Federal Bank of the Midwest. The investigation also found that defendant had caused a total of **$76,763.51** in unauthorized disbursements to be made from the *Holy Cross Properties* checking account at Ann Arbor State Bank. And it found that defendant had used his Holy Cross corporate credit card to pay for his own personal expenses and those of his family totaling **$36,536.84**. Thus, defendant's total thefts from Holy Cross added up to **$247,867.75**, which the parties believe is the Sentencing Guidelines loss in this case.

The thefts from the two checking accounts occurred between November 2014 and October 2016. The misuse of the Holy Cross corporate credit card occurred between September 2014 and February 2017.

### 2.  *JKL Consulting/JKL Products*

There were unauthorized payments to ***JKL Consulting/JKL Products*** from both checking accounts totaling $94,892.40. *JKL Consulting LLC*, dba *JKL Products*, was organized in August 2011 by defendant and his wife. However, defendant's wife was a registered nurse and not involved at all with the consulting side of the company. *JKL Consulting/JKL Products* was located at their house in Grosse Pointe Park.

- 9 -

From May 2013 through March 2017, Holy Cross paid *JKL Consulting/JKL Products* approximately $230,00.00. Some of those payments were legitimate, for *JKL Products* sold miscellaneous merchandise to Holy Cross, including customized sweatshirts, T-shirts, other apparel, business cards, envelopes, and brochures. But, as noted above, $94,892.40 of the amount paid to *JKL Consulting/ JKL Products* was nothing more than the theft of Holy Cross funds by defendant.

When defendant requested the Holy Cross accounts payable clerk to issue unauthorized *Holy Cross Children's Services* checks, he would create invoices to make it appear that the payments were for various legitimate expenses of Holy Cross. For example, there was what appeared to be an invoice to *JKL Consulting* from Foremost Tech Services reflecting that Foremost Tech Services had provided services to *JKL Consulting* and that *JKL Consulting* had paid Foremost Tech Services for such services. But there was no Foremost Tech Services, and the address on the invoice was the home address of a childhood friend of defendant. Thus, *JKL Consulting* had in fact paid nothing to Foremost Tech Services, and there was no reason for Holy Cross to reimburse *JKL Consulting*. *JKL Consulting/ JKL Products* is further discussed below at p. 19.

- 10 -

### 3.  *First Nation Security*

There were also unauthorized payments to **First Nation Security** totaled $41,500.00. *First Nation Security, LLC* was formed in December 2012. On paper, there were two principals. One was a brother of defendant's wife, a resident of Grosse Pointe Woods, and a recently retired police officer. The second was one of defendant's sisters, a resident of Florida. Although, on the surface, defendant had nothing to do with *First Nation Security*, he was largely in control of *First Nation Security*.

*First Nation Security* was established to provide security services at Holy Cross facilities, particularly the Samaritan Center, which was a large community resource center on the east side of Detroit that provided social services and other forms of assistance to low-income residents.

As soon as *First Nation Security* was formed, defendant arranged for Holy Cross to enter into a contract with *First Nation Security*. From January 2013 through April 2017, Holy Cross paid *First Nation Security* a substantial amount of money. Approximately $41,500.00 of the payments to *First Nation Security* represented the theft of Holy Cross funds by defendant. *First Nation Security* is further discussed below at pp. 19-20.

- 11 -

### 4. *Miscellaneous Payees*

Defendant also used checks drawn on the checking account of *Holy Cross Properties* to make unauthorized payments to

| | |
|---|---|
| **MS** (initials) | $3,130.00, for repairs on his personal vehicles, |
| **American Express** | $7,363.75, for his wife's personal AmEx account, |
| **Fay Servicing** | $7,194.76, for his personal mortgage loan, |
| **JS Home Improvement** | $12,500.00, for a new roof on his house, and |
| **Grosse Pointe South Gridiron Club** | $200.00, as a donation to a high school football fundraising group |

### 5. *Defendant's Brother-in-Law*

Defendant also made unauthorized payments to one of his wife's brothers. Defendant caused 15 checks drawn on the account of *Holy Cross Children's Services* to be made payable to him, which totaled $44,550.00. He kicked back to defendant $21,895.50 of the $44,550.00 in the form of nine checks drawn on his personal checking account, eight of which were made payable to defendant.

### 6. *Corporate Credit Card*

Holy Cross maintained a corporate credit card account with American Express. About 10 Holy Cross employees, including defendant, were given American Express corporate credit cards that were to be used only for the business

- 12 -

of Holy Cross. Charges on all of the corporate American Express credit cards were paid by Holy Cross.

As described above, defendant used his Holy Cross corporate credit card to pay for personal expenses totaling $36,536.84. Those charges included but were not limited to payments for lodging at resorts (e.g., Ocean Sky Hotel and Resort, Ft. Lauderdale, FL); dining at restaurants (e.g., Farmers Table, Boca Raton, FL); travel (e.g., Delta Airlines); entertainment (e.g., Northern Lights Recreation, Harbor Springs, MI); clothing purchased at apparel and department stores (e.g., Lululemon Athletica, Ann Arbor, MI; Macy's, Troy, MI); groceries; federal income taxes; and tires for his cars (Belle Tire, Grosse Pointe Farms, MI). There was also a $675.00 payment to the Grosse Pointe South Dugout Club, a high school baseball fundraising group related to the Grosse Pointe South Gridiron Club, to which defendant had sent a $200.00 check drawn on the checking account of *Holy Cross Properties*, as described above. And defendant used his Holy Cross corporate credit card to make $4,200.00 in payments to printing businesses that provided goods and services to *JKL Products*, his wife's business.

### B.  Punishment and Crime Control

As this Court well knows, the key provision of the Sentencing Reform Act of 1984 is section 3553(a)(2), which provides that a district court

- 13 -

shall consider – . . .

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2). "These four considerations – retribution, deterrence, incapacitation, and rehabilitation – are the four purposes of sentencing generally, and a court must fashion a sentence 'to achieve the[se] purposes . . . to the extent that they are applicable' in a given case." *Tapia v. United States*, 564 U.S. 319, 325 (2011) (quoting 18 U.S.C. § 3551(a)).

These

purposes can be categorized into two general philosophies. The first is just punishment, sometimes called "just desert" or retribution, which is the criteria of justification for deontological theories [i.e., theories of morality or ethics]. These trace their roots to the philosophy of Immanuel Kant or to the biblical lex talionis ("life for life . . . eye for eye, tooth for tooth . . ."). The second general philosophy is utilitarianism. Deterrence, incapacitation, and rehabilitation are all utilitarian crime-control measures tracing their philosophical roots to Jeremy Bentham.

- 14 -

Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules:  Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 AM. CRIM. L. REV. 19, 21 n.6 (2003).

As described above, "just punishment" refers to the concept of retribution. Retribution is an essential part of the fabric of criminal justice. This factor, of course, does not alone dictate any particular sentence. It is simply one of a number of factors courts must consider. But, like any relevant factor, it should not be disregarded.

Determining what punishment is just in any given case must take into account not only the nature of the offense, discussed above at pp. 8-13, but also the victims of the offense. Here, the principal victim, of course, was *the Holy Cross organization*, a nonprofit organization providing financial support, welfare and behavioral healthcare services, and other social services to children and families in Michigan, focusing mostly on Southeast Michigan and Mid-Michigan. In a letter provided to the government for submission to this Court, Holy Cross explained that defendant's crime required that it "scale back some of its operations," i.e., decrease the services it could provide to those in need, and "reduce the number of its employee." GOV. EXHIBIT 1 (filed under seal).

- 15 -

But Holy Cross also related that it suffered other forms of damage: it paid a substantial amount of money to an outside firm to conduct a forensic audit of defendant's handling of Holy Cross funds once suspicions about his conduct emerged; it has paid that same firm to review its income tax filings and file delinquent and amended income tax returns; it has hired a consultant to advise it as to how to handle its finances going forward; it has paid attorney's fees and litigation expenses in connection with its civil lawsuit against defendant; and it has had to communicate with and reassure many of its donors, who have expressed some reluctance to make contributions to Holy Cross in the future. GOV. EXHIBIT 1 (filed under seal).

In addition, because defendant was the CEO of Holy Cross, his criminal conduct and sudden firing resulted in a major disruption of the operations of Holy Cross for a substantial length of time in a number of different ways.

There were also individual victims, including Holy Cross employees whose employment was curtailed or eliminated and those who needed the services of Holy Cross but whom Holy Cross was unable to provide for because of the financial damage defendant had caused.

- 16 -

Given the nature and seriousness of defendant's crime and the number of people it harmed, in one way or another, the interest in just punishment in this case is substantial, and a substantial term of imprisonment is called for.

Another section 3553(a)(2) factor, which is related, is deterrence. "'Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.'" *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)); *accord United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Martin*, 455 F.3d at 1240. As this court knows, general deterrence is the idea that others will be deterred from committing crimes if a sentencing judge makes an example of the defendant being sentenced.

Defendant's offense is exactly the type of white collar criminal that needs to be deterred: a well-educated individual who sees a financial opportunity and uses his intelligence and corrupt character to exploit it through dishonest means and who does thereby enrich himself. In this case, the strong interest in general deterrence can only be served by a substantial term of imprisonment.

- 17 -

## C.  Defendant's History and Characteristics

A district court "shall consider – (1) . . . the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

### *1. Personal History*

Defendant is 57 years old. He grew up in metropolitan Detroit. He is married with nine children, five of whom still live at home, which is in Grosse Pointe Park. His wife is a registered nurse. PSR ¶¶ 46-49.

 He graduated from Purdue University in 1986 with a bachelor's degree in accounting. He was hired as an accountant by the national accounting firm of Price Waterhouse, and he became a CPA in 1990. PSR ¶¶ 54, 63.

Subsequently, he was employed as the COO of Ziebart International Corp., the CEO of the AFS Group of Companies, and then a self-employed business consultant. PSR ¶¶ 60-62. He was also the CEO and CFO of *Collision on Wheels LLC*. *See* pp. 20-24 below. In March 2012 he became the CFO of Holy Cross and in January 2015 its CEO. PSR ¶ 59. After he was terminated in April 2017 he once again became a self-employed business consultant. PSR ¶ 58. Then, from October 2020 to April 2021, he was employed as the CFO of Trucenta, a local recreational cannabis company. PSR ¶ 57. Currently, he is self-employed. PSR ¶ 55.

- 18 -

## 2. *Dishonest Character: Self-Dealing*

As noted above, defendant caused Holy Cross funds to be paid to businesses in which he had a personal and financial interest, i.e., *JKL Consulting/JKL Products* and *First Nation Security*. Some of those payments constituted outright thefts by defendant. But even the payments that weren't thefts were still blatant violations by defendant of Holy Cross's formal policy against purchasing goods or services while having a conflict of interest. He steered approximately $230,000 in Holy Cross funds to *JKL Consulting/JKL Products* and approximately $2.2 million in Holy Cross funds to *First Nation Security*, both companies in which he had a personal and direct financial interest.[2] This pervasive self-dealing, while not necessarily criminal, enabled defendant to enrich himself and reflected the corrupt manner in which he carried out his responsibilities as Holy Cross's CFO and CEO.

In addition, the reason defendant's sister, a resident of Florida, was made a principal of *First Nation Security* was because she was a retired female U.S. Air Force officer and, as such, could help *First Nation Security* secure government contracts through the HUBZone program, which was administered by the U.S. Small Business Administration. ("HUBZone" stands for historically underutilized

---

[2]  Approximately $95,000 of the $230,000 and approximately $41,500 of the $2.2 million represented the outright theft of Holy Cross funds by defendant.

business zone.) The program helps small businesses in communities with high unemployment gain preferential access to federal procurement opportunities. The Samaritan Center, located on Conner Avenue on the east side of Detroit, was in a HUBZone. *First Nation Security*'s plan to obtain federal contracts under the HUBZone program, however, was never realized.

In addition to the payments to *JKL Consulting/JKL Products* and *First Nation Security*, described above, defendant caused payments totaling $16,200.00 to be made to *KTK Professional Services*, a business owned by a brother of defendant's wife, and payments totaling $9,800.00 to be made to *Grapevine Learning*, a company owned by a second brother of defendant's wife.

### 3.  Dishonest Character: Collision on Wheels LLC

In 2006, defendant formed *Collision on Wheels LLC*, an auto collision repair franchisor based in Warren, Michigan. *Collision on Wheels* franchises were located throughout the United States. Defendant was its CFO and CEO. Defendant formed other companies during this decade, including *Automotive Franchise Systems LLC* (2003), *AFS Holding LLC* (2003), *Aftermarket Experts LLC* (2004), *L & L Venture Group LLC* (2005), *GJL Properties LLC* (2007), *LML Products Group, LLC* (2008), *Automotive Update LLC* (2008), *Property Inspections USA, LLC* (2008), *Property Maintenance USA, LLC* (2008), and *Franchise Consulting Group LLC*

- 20 -

(2009). The addresses of the registered offices of most of these businesses were in Warren, Michigan.

In October 2009, a couple in California who were *Collision on Wheels* franchisees sued defendant and other officers of *Collision on Wheels* in state court in California, alleging that their decision to invest in *Collision on Wheels* and become franchisees was based on misrepresentations in the offering materials of *Collision on Wheels*. In December 2009, the case was removed to the U.S. District Court for the Northern District of California, in San Jose. *Tankersley v. Lynch*, No. 09-CV-05763 (N.D. Cal.).

The *Tankersley* litigation was also proceeding on a parallel arbitration track, and in June 2010, there was an interim arbitration award for Tankersley and Diehl in the amount of $567,000. The next month, July 2010, *Collision on Wheels* filed for bankruptcy protection in Detroit. *In re Collision on Wheels LLC*, No. 10-BK-63350 (E.D. Mich. Bankruptcy Court).

In February 2011, the interim arbitration award of $567,000 was made final, and in June 2011, that final award was confirmed by a federal district judge in Detroit. *Tankersley v. Collision on Wheels* LLC, No. 11-CV-10901. In July 2011, the federal case in San Jose was transferred to a federal district judge in Detroit. *Tankersley v. Lynch*, No. 11-CV-12847 (E.D. Mich.).

- 21 -

In August 2011, while the *Collision on Wheels* bankruptcy case and the *Tankersley* litigation were pending, defendant and his wife formed *JKL Consulting LLC*, dba *JKL Products*, as noted above. *JKL Consulting/JKL Products* was located at their house in Grosse Pointe Park.

In March 2012, defendant joined Holy Cross as its CFO.

In July 2012, the trustee of the bankruptcy estate of *Collision on Wheels* filed an adversary complaint against defendant and others, alleging that they caused approximately $7.5 million in *Collision on Wheels* funds to be fraudulently transferred to *Automotive Franchise Systems LLC*, another business controlled by defendant. *Dery v. Lynch*, Adversary No. 12-AP-5334 (E.D. Mich. Bankruptcy Court).

Two months later, in September 2012, defendant himself filed for bankruptcy relief under Chapter 7 of the bankruptcy code. *In re John Lynch*, No. 12-BK-61025 (E.D. Mich. Bankruptcy Court). In his schedules, defendant claimed to have $400,000 in personal assets and $1.7 million in personal liabilities, including a $730,000 million liability to Chase Bank, a $567,000 liability to Marian Tankersley and Richard Diehl, a $127,000 liability to his late father's revocable trust, and a $38,000 liability to two law firms. Defendant also listed a potential liability of $22.6 million arising from the *Dery v. Lynch* lawsuit.

- 22 -

In December 2012, as explained above, defendant and a brother-in-law formed *First Nation Security, LLC*, and defendant caused Holy Cross to enter into a contract with *First Nation Security*, which resulted in Holy Cross payments to *First Nation Security* totaling roughly $2.2 million.

In August 2013, defendant and the trustee in his bankruptcy case, *In re John Lynch*, No. 12-BK-61025 (E.D. Mich. Bankruptcy Court), entered into a compromise agreement pursuant to which defendant was required to pay the bankruptcy trustee $30,000 in installments that were spread out over roughly two years, from August 2013 to July 2015. (ECF Nos. 59, 67.)

In October 2013, defendant and the trustee in the *Collision on Wheels* bankruptcy case, *In re Collision on Wheels LLC*, No. 10-BK-63350 (E.D. Mich. Bankruptcy Court), entered into a settlement pursuant to which defendant was required to immediately pay the bankruptcy trustee $10,000. (ECF No. 141.) The following year the CWI bankruptcy trustee filed a Final Account And Distribution Report (ECF No. 173), and the case was closed.

In June 2014, in defendant's bankruptcy case, a federal bankruptcy judge issued an order discharging defendant's debts. *In re John Lynch*, No. 12-BK-61025 (ECF No. 75). In May 2016, the bankruptcy trustee filed a Final Account And Distribution Report stating, among other things, that scheduled creditors' claims

totaling over $24.3 million had been discharged without being paid. (ECF. No. 99.) Most of those claims arose from the *Collision on Wheels* bankruptcy, but the other unpaid claims were based on defendant's personal debts to Chase Bank, American Express, Discover Card, Portfolio Recovery Associates, two law firms, and others.

This summary of the lawsuits arising from the collapse of *Collision on Wheels* demonstrates that both before and during his employment at Holy Cross, defendant was embroiled in litigation involving (1) a failing business of which he was the CEO and CFO, *Collision on Wheels*, that included allegations of fraud and (2) his own serious, personal financial problems. And the whole time he was incurring large attorney's fees. The point is that defendant has had an overwhelming motive to steal and commit fraud, which began no later than June 2010, when an arbitrator awarded two California franchisees of *Collision on Wheels* $567,000 in connection with a lawsuit against defendant and other officers of *Collision on Wheels*. And, in March 2012, he happened to land in a place, Holy Cross, that presented him with an opportunity to exploit what was easy access to a lot of money.

Defendant's pattern of incurring debts, shirking them, and obtaining money by any dishonest means necessary is a reflection of an arrogant, disdainful, and corrupt character. This should weigh heavily in this Court's sentencing decision.

## D.  Unwarranted Disparity

A district court "shall consider –  . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Supreme Court has observed that in enacting the Sentencing Guidelines, "Congress 'sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct[.]'" *Rita v. United States*, 551 U.S. 338, 349 (2007); *see also United States v. Bass*, 17 F.4th 629, 636 (6th Cir. 2021) ("'We have explained . . . that this factor concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between codefendants.'"). Thus, the more a district court imposes a sentence in the neighborhood of the applicable guideline range, the more it contributes to national uniformity. "[I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350.

## E.  Restitution

Finally, a district court "shall consider – . . . (7) the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). The parties and probation officer agree that the Sentencing Guidelines loss amount in this case is

$247,867.75. Accordingly, this Court should order defendant to pay restitution to Holy Cross in the amount of **$247,867.75**.

However, defendant should receive credit for funds Holy Cross has received and will continue to receive from defendant in connection with a civil lawsuit it filed against him in Wayne County Circuit Court. *See* 18 U.S.C. § 3664(j)(2)(B) ("Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in – . . . (B) any State civil proceeding, to the extent provided by the law of the State."). In October 2019, defendant signed a settlement agreement with Holy Cross and its insurance company pursuant to which defendant would pay Holy Cross and its insurance company $318,000 plus 7% interest over a period of three and a half years. The government believes that defendant has paid about $250,000 so far.

Defendant's future payments under the settlement agreement should be made a special condition of any supervised release this Court imposes.

## VI. CONCLUSION

For the reasons explained above, the government requests this Court to find that defendant's advisory guideline range is **27-33 months in prison**. And, taking into account all of the relevant facts and section 3553(a) factors, the government

requests this Court to impose a term of imprisonment within that range. The

government also requests this Court to order defendant to pay restitution to Holy

Cross in the amount of **$247,867.75**. Finally, the government requests this Court to

impose a term of supervised release of three years with a special condition that

defendant continue to make the monthly payments required by his settlement

agreement with Holy Cross.

<div style="margin-left:40%">

Respectfully submitted,

DAWN N. ISON
*United States Attorney*

s/Stephen L. Hiyama
STEPHEN L. HIYAMA
*Assistant United States Attorney*
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3220
phone: 313-226-9674
e-mail: stephen.hiyama@usdoj.gov
bar no.: P32236

</div>

Date: February 9, 2022

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

|                    |                                |
|--------------------|--------------------------------|
| Plaintiff,         | No. 21-CR-20452                |
| -vs-               | Hon. Bernard A. Friedman       |
| D-1   JOHN R. LYNCH, |                              |
| Defendant.         |                                |

_____/

## **CERTIFICATE OF SERVICE**

I certify that on February 9, 2022, I electronically filed the *Government's Sentencing Memorandum* with the Clerk of the Court using the ECF system, which will send notification of such filing to the following ECF participant(s):  Michael Rataj and William Swor.


s/Stephen L. Hiyama
STEPHEN L. HIYAMA
*Assistant United States Attorney*

Date:  February 9, 2022